UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

)
UNITED STATES OF AMERICA )
)
v. )                    Cr. No. 14-095-JJM-PAS
)
ALLEN PROUT )
Defendant. )
)

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Allen Prout has petitioned this Court pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his judgment of conviction, entered after he pled guilty to robbery conspiracy, possession of a firearm in furtherance of a crime of violence and drug trafficking crime, and being a felon in possession of a firearm. He claims that he is entitled to a new trial based on ineffective assistance of counsel. The Court finds that Mr. Prout's Motion to Vacate lacks merit and thus DENIES his petition.

## FACTS

On July 23, 2014, a federal grand jury sitting in the District of Rhode Island indicted Mr. Prout and another individual on charges of robbery conspiracy (Count I), heroin conspiracy (Count II), possession of a firearm in furtherance of a crime of violence and drug trafficking crime (Count III), and being a felon in possession of a firearm (Count IV). The charges arose from a "sting" operation in which Mr. Prout, his co-defendant, and a confidential informant ("CI") planned to rob a heroin stash house. Pursuant to a written Plea Agreement, Mr. Prout pled guilty to Counts I, III,

and IV. Count II was dismissed by the Government. Mr. Prout was sentenced on March 9, 2016, to a term of imprisonment of 156 months. An Amended Judgment was entered on March 11, 2016. Under the terms of the Plea Agreement, Mr. Prout did not appeal the judgment of conviction or sentence.

Mr. Prout timely filed the instant Motion to Vacate on March 10, 2017.[1]

## LAW

### A.    Section 2255

Section 2255 provides for post-conviction relief only if the court sentenced a petitioner in violation of the Constitution or lacked jurisdiction to impose the sentence, if the sentence exceeded the statutory maximum, or if the sentence is otherwise subject to collateral attack. *United States v. Addonizio*, 422 U.S. 178, 185 (1979); *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998). In attempting to collaterally attack his sentence, the petitioner bears the burden of demonstrating "exceptional circumstances" that warrant redress under § 2255. *See Hill v. United States*, 368 U.S. 424, 428 (1962); *Mack v. United States*, 635 F.2d 20, 26-27 (1st Cir. 1980). For example, an error of law must constitute a "fundamental defect which inherently results in a complete miscarriage of justice." *Hill*, 368 U.S. at 428; *accord David*, 134 F.3d at 474.

---

[1] The Motion to Vacate is dated March 10, 2017, and is deemed filed on that date. *See Houston v. Lack*, 487 U.S. 266, 270 (1988)(concluding that pleadings are deemed filed on date prisoner relinquishes control over documents).

B. *Strickland*

The Sixth Amendment guarantees defendants the right to effective assistance of counsel. *Lema v. United States*, 987 F.2d 48, 51 (1st Cir. 1993)(citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). However, "[t]he Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective assistance under the circumstances then obtaining." *United States v. Natanel*, 938 F.2d 302, 309-10 (1st Cir. 1991).

A defendant who claims that he was deprived of his Sixth Amendment right to effective assistance of counsel must demonstrate:

(1)     that his counsel's performance fell below an objective standard of reasonableness; and

(2)     a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*Strickland*, 466 U.S. at 687-88, 694; *see also United States v. Manon*, 608 F.3d 126, 131 (1st Cir. 2010)(same). In assessing the adequacy of counsel's performance, a defendant "'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' and the court then determines whether, in the particular context, the identified conduct or inaction was 'outside the wide range of professionally competent assistance.'" *Manon*, 608 F.3d at 131 (quoting *Strickland*, 466 U.S. at 690). With respect to the prejudice requirement under *Strickland*, a "reasonable probability is one sufficient to undermine confidence in the outcome. ... In making the prejudice assessment, [the court] focuses on the fundamental fairness of the proceeding." *Id.* "Unless a defendant makes both

3

showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687; *see also Reyes-Vejerano v. United States*, 117 F. Supp. 2d 103, 107 (D.P.R. 2000)("The petitioner has the burden of proving both prongs of this test, and the burden is a heavy one."). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

*Strickland* instructs that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Moreover, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Finally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

The same principles apply in the context of guilty pleas. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985). The *Hill* Court held that "the two-part *Strickland v.*

*Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Id.* at 58; *see also Padilla v. Kentucky*, 559 U.S. 356, 371 n.12 (2010)("In *Hill*, the Court recognized—for the first time—that *Strickland* applies to advice respecting a guilty plea."). The first prong of the *Strickland* test is nothing more than a restatement of the standard of attorney competence described above. *Hill*, 474 U.S. at 58.

> The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

*Id.* at 59; *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012) ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice."). The *Hill* Court reiterated that, as stated in *Strickland*, "these predictions of the outcome at a possible trial, where necessary, should be made objectively ...." 474 U.S. at 59-60; *see also Padilla*, 559 U.S. at 372 (noting that "to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances").

## ANALYSIS

As noted above, Mr. Prout filed the Motion to Vacate (ECF No. 78) on March 10, 2017. He subsequently filed a memorandum in support of his motion (ECF No. 91) and an amendment/clarification of one of the claims in the original Motion to

Vacate (ECF No. 97).[2]   The Government's objected (ECF No. 96) and Mr. Prout filed

a reply (ECF No. 99) to the objection.[3]

Mr. Prout alleges that he received ineffective assistance of counsel during the

pretrial and sentencing proceedings.  He raises six grounds for relief,[4] all of which

claim that counsel was ineffective for failing to make certain arguments.  Several of

Mr. Prout's arguments are based on the Hobbs Act, 18 U.S.C. § 1951.  He also

contends that the Government "manufactured" jurisdiction over the § 924(c) charge

and that counsel failed to object; that counsel failed to argue that the conduct of the

Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") constituted racial

profiling and discriminatory law enforcement; and that counsel should have

challenged the Court's enhancement of his sentence as a career offender.  The Court

will address Mr. Prout's Hobbs Act arguments together, as they tend to overlap.  His

remaining claims will be discussed separately.

A.    Hobbs Act Allegations

The Hobbs Act provides that:

> Whoever in any way or degree obstructs, delays, or affects commerce or
> the movement of any article or commodity in commerce, by robbery or
> extortion or attempts or conspires so to do, or commits or threatens
> physical violence to any person or property in furtherance of a plan or

---

[2] The Court refers to the Motion to Vacate and the subsequent amendment to that motion collectively as the "Motion to Vacate."

[3] *See* n.1.

[4] Mr. Prout originally included a seventh claim of error, but voluntarily withdrew the argument from his memorandum and requests that the Court strike the claim from the Motion to Vacate. ECF No. 91 at 82; *see also* ECF No. 78 at 12. The Court grants that request.

purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).[5] Mr. Prout claims that counsel was ineffective for failing to argue that: (1) the Government's "broad expansion of [the] Hobbs Act under 1951(a) exceeded constitutional limits expressed by Congress upon enactment," ECF No. 78 at 4;[6] (2) a "statute enacted pursuant to the Commerce Clause does not constitutional[ly] reach non-commercial and non-economic conduct that is purely intrastate," *id.* at 5; and (3) "the Hobbs Act commerce effect was not proven where the Government failed to prove depletion of any assets o[f] business engaged in interstate commerce," *id.* at 8.[7]

---

[5] Section 1951 defines robbery and commerce as follows:

(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or anyone in his company at the time of the taking or obtaining.
...

(3) the term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951(b).

[6] Page citations refer to the ECF pagination.

[7] Mr. Prout's capitalization has been eliminated except where appropriate.

Mr. Prout relies primarily on the United States Supreme Court's decisions in

*United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S.

598 (2000), for his arguments that the Hobbs Act

> did not apply to the circumstances presented here. Fictitious robbery of
> a fictitious drug dealer at a fictitious drug stash house does not regulate
> economic or commercial activity, nor does it show a relationship,
> attenuated or otherwise, between the regulated activity and persons or
> things in interstate commerce–and definitely does not invoke any
> commerce power necessary in order to regulate intrastate criminal
> activity.

ECF No. 91 at 60. Mr. Prout's reliance on *Lopez* and *Morrison* is misplaced.

In *Lopez*, the Supreme Court held that the Gun-Free School Zones Act

of 1990, 18 U.S.C. § 922(q)(1)(A), exceeded the authority of Congress "[t]o

regulate Commerce ... among the several States ...." 514 U.S. at 551 (quoting

U.S. Const. art. I, § 8, cl. 3)(alterations in original). The Court stated: "The Act

neither regulates a commercial activity nor contains a requirement that the

possession be connected in any way to interstate commerce." *Id.*

After tracing the history of the Supreme Court's Commerce Clause

jurisprudence, *see id.* at 553-58, the *Lopez* Court stated that the Court had

"identified three broad categories of activity that Congress may regulate under

its commerce power," *id.* at 558.

> First, Congress may regulate the use of the channels of interstate
> commerce. Second, Congress is empowered to regulate and protect the
> instrumentalities of interstate commerce, or persons or things in
> interstate commerce, even though the threat may come only from
> intrastate activities. Finally, Congress' commerce authority includes
> the power to regulate those activities having a substantial relation to
> interstate commerce.

*Id.* at 558-59 (internal citations omitted). In analyzing 922(q)(1)(A), the Court focused on the third category, whether the statute could be sustained "as a regulation of an activity that substantially affects interstate commerce." *Id.* at 559. The Court found that:

> Section 992(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

*Id.* at 561 (footnote omitted). Further, "§ 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.; see also id.* at 562 (noting that "§ 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.").

Similarly, the Supreme Court in *Morrison* held that Congress lacked authority to enact a provision of the Violence Against Women Act ("VAWA"), 42 U.S.C. § 13981, which provided a federal civil remedy for victims of gender-based violence. 529 U.S. at 601-02. The *Morrison* Court relied on the *Lopez* framework for its analysis. *Id.* at 609. Again the Court found that the VAWA did not regulate activity that was economic in nature, nor did it contain a jurisdictional element:

> With these principles underlying our Commerce Clause jurisprudence as reference points, the proper resolution of the present cases is clear.

9

Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity. While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.

Like the Gun-Free School Zones Act at issue in *Lopez*, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce. Although *Lopez* makes clear that such a jurisdictional element would lend support to the argument that § 13981 is sufficiently tied to interstate commerce, Congress elected to cast § 13981's remedy over a wider, and more purely intrastate, body of violent crime.

*Id.* at 613 (internal citation omitted).[8]

Mr. Prout argues that the activities at issue here "cannot properly be characterized as commercial or economic activity." ECF No. 91 at 13. In addition, Mr. Prout contends that the Government "overstepped its boundaries by attempting to expand the Hobbs Act statute's broad reach beyond its limit and outside of its constitutional reach granted by the statute." *Id.* at 36. He is mistaken.

"The Hobbs Act's scope extends to the limit of Congress' Commerce Clause authority." *United States v. Capozzi*, 347 F.3d 327, 335 (1st Cir. 2003) ("*Capozzi I*"); *see also United States v. McCormack*, 371 F.3d 22, 27 (1st Cir. 2004)("The commerce element of a § 1951(a) offense extends to the limit of Congress's Commerce Clause authority."), *judgment vacated on other grounds, McCormack v. United States*, 543

---

[8] The Court also stated that, in contrast with the Gun-Free School Zones Act, the VAWA was supported by legislative findings "regarding the serious impact that gender-motivated violence has on victims and their families." *Morrison*, 529 U.S. at 614. The Court, however, stated that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Id.*

U.S. 1098 (2005). The First Circuit has "regularly held that commerce is affected for the purposes of the Hobbs Act if there is a realistic probability of a *de minimis* effect on interstate commerce." *United States v. Capozzi*, 486 F.3d 711, 725-26 (1st Cir. 2007) ("*Capozzi II*") (internal quotation marks omitted); *see also Taylor v. United States*, 136 S.Ct. 2074, 2079 (2016)(noting "unmistakably broad" language of Hobbs Act). Significantly, "the *de minimis* test under the Hobbs Act remains applicable after the Supreme Court's Commerce Clause decisions in *United States v. Lopez* and *United States v. Morrison*." *McCormack*, 371 F.3d at 28 (internal citations omitted); *see also Capozzi I*, 347 F.3d at 336 ("the *Lopez* decision does not render the Hobbs Act's '*de minimis* effect' on interstate commerce standard unconstitutional").[9]

Narcotics trafficking "typically is an enterprise that affects interstate commerce ...." *United States v. Guerrier*, 669 F.3d 1, 7 (1st Cir. 2011); *see also Taylor*, 136 S. Ct. at 2080 ("[T]he activity at issue, the sale of marijuana, is unquestionably an economic activity. It is, to be sure, a form of business that is illegal under federal law and the laws of most States. But there can be no question that marijuana trafficking is a moneymaking endeavor ...."). In *Taylor*, the Supreme Court stated:

> In *Raich*, the Court addressed Congress's authority to regulate the marijuana market. The Court reaffirmed "Congress's power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." The production,

---

[9] In *Capozzi I* the First Circuit rejected an argument similar to that made by Mr. Prout here, namely that, after *Lopez*, "the '*de minimis* effect' standard for a Hobbs Act violation is no longer valid." 347 F.3d at 335; *see also* ECF No. 91 at 16. As noted above, the court found that the *Lopez* decision did not render that standard unconstitutional, *Capozzi I*, 347 F.3d at 336, and held that "the Hobbs Act's '*de minimis* effect' on interstate commerce standard was constitutionally applied to Capozzi's conduct," *id.*

11

possession, and distribution of controlled substances constitute a "class of activities" that in the aggregate substantially affect interstate commerce, and therefore, the Court held, Congress possesses the authority to regulate (and to criminalize) the production, possession, and distribution of controlled substances even when those activities occur entirely within the boundaries of a single State.

136 S. Ct. at 2080 (quoting *Gonzalez v. Raich*, 545 U.S. 1, 17 (2005)(internal citation omitted); *see also id.* at 2079 (noting that "activities in this third category—those that 'substantially affect' commerce—may be regulated so long as they substantially affect interstate commerce in the aggregate, even if their individual impact on interstate commerce is minimal"). Further, "[b]ecause Congress may regulate these intrastate activities based on their aggregate effect on interstate commerce, it follows that Congress may also regulate intrastate drug *theft*." *Id.* at 2077; *see also id.* at 2081 ("As long as Congress may regulate the purely intrastate possession and sale of illegal drugs, Congress may criminalize the theft or attempted theft of those same drugs.").

There remains the jurisdictional issue. In *Capozzi I*, the First Circuit noted that the defendant had overlooked "a crucial distinction between the statute at issue in *Lopez* and the Hobbs Act." 347 F.3d at 335.

> In drafting the Hobbs Act, Congress included a jurisdictional element which it failed to include in the Gun Free School Zones Act. The Hobbs Act requires the government to prove that the extortion or robbery be connected to interstate commerce. Rather than applying to all robberies or extortions, the Hobbs Act applies to only that specific subset of robberies or extortions that affect interstate commerce. Thus, the Hobbs Act ensure[s], through case-by-case inquiry, that the [extortion or robbery] in question affects interstate commerce.

*Id.* at 335-36 (alterations in original)(internal quotation marks omitted); *cf. Lopez*, 514 U.S. at 561-62. The *Taylor* Court observed that "it makes no difference under our cases that any actual or threatened effect on commerce in a particular case is

12

minimal." 135 S. Ct. at 2081. Nor is certainty of a *de minimis* effect required.

*Guerrier*, 669 F.3d at 7. "Even potential future effects may be the basis for interstate

commerce jurisdiction under the Hobbs Act." *Capozzi II*, 486 F.3d at 726.

Connecting the dots here, the Supreme Court stated in *Taylor*:

> The Hobbs Act criminalizes robberies affecting commerce over which the
> United States has jurisdiction. Under *Raich*, the market for marijuana,
> including its intrastate aspects, is commerce over which the United
> States has jurisdiction. It therefore follows as a matter of logic that a
> robber who affects or attempts to affect even the intrastate sale of
> marijuana grown within the State affects or attempts to affect commerce
> over which the United States has jurisdiction.

136 S. Ct. at 2080 (internal citation omitted); *see also id.* at 2077-78. Mr. Prout

argues, nonetheless, that the fictitious drugs at issue in this case have nothing to do

with commerce. ECF No. 91 at 18. The First Circuit rejected a similar argument in

*United States v. Turner*, 501 F.3d 59 (1st Cir. 2007). There, the defendant and others

planned to rob a Loomis Fargo armored car facility. *Id.* at 64. Unbeknownst to

Turner, however, the planned robbery was actually an FBI sting. *Id.* Turner was

charged with conspiracy and attempted robbery under the Hobbs Act. *Id.* at 65. He

argued that "the factual impossibility of the robbery foreclose[d] as a matter of law

the possibility that his crime had a substantial impact on interstate commerce." *Id.*

at 69. The First Circuit affirmed Turner's conviction, stating that "[w]hile the

substantive crime that is the object of the conspiracy may be impossible to achieve,

the conspiracy nonetheless qualifies as an offense for which a person may be

prosecuted under federal law." *Id.* at 70 (internal quotation marks omitted); *see also*

*United States v. Nguyen*, 246 F.3d 52, 54 (1st Cir. 2001)("All that matters is that [the

13

defendant] entered a conspiracy whose *objective* was to steal the assets of an entity in interstate commerce. That the conspiracy failed to accomplish such objective is irrelevant.").

Alternatively, Mr. Prout contends that the Government "failed to prove that the assets of any business engaged in interstate commerce were depleted." ECF No. 91 at 76. Therefore, the "Hobbs Act commerce effect was not proven ...." *Id.* One way of establishing the requisite *de minimis* effect on interstate commerce "is to show that the defendant's activity minimally depletes the assets of an entity doing business in interstate commerce." *Capozzi II,* 486 F.3d at 726 (internal quotation marks omitted). Echoing his earlier assumption that fictitious drugs cannot affect interstate commerce, *see* ECF No. 91 at 12, presumably Mr. Prout's argument here is that a fictitious drug dealer is not an entity doing business in interstate commerce. As noted above, however, "it is the purpose of the conspiracy, rather than the result the conspirators achieve, that is relevant in determining the impact on commerce." *McCormack,* 371 F.3d at 28. Had Mr. Prout and his co-conspirator robbed an actual drug dealer of narcotics and money—in other words, had they achieved the objective of the conspiracy—clearly the "assets" of an "entity" doing business, albeit illegal, in interstate commerce would have been depleted. *See id.; Nguyen,* 246 F.3d at 54; *cf. Turner,* 501 F.3d at 70.

It is clear from the foregoing that the Government acted within its authority in prosecuting Mr. Prout and that the Court possessed jurisdiction over the matter. The arguments Mr. Prout faults counsel for failing to make lack merit. Therefore,

counsel was not ineffective for declining to pursue those arguments. *See Dure v. United States*, 127 F. Supp. 2d 276, 280 (D.R.I. 2001)(citing *Vieux v. Pepe*, 184 F.3d 59, 64 (1st Cir. 1999)("Counsel cannot be deemed ineffective for failing to pursue futile arguments.")); *see also Knight v. Spencer*, 477 F.3d 6, 16 (1st Cir. 2006) (quoting *Vieux*, 184 F.3d at 64)("failing to pursue a futile tactic does not amount to constitutional ineffectiveness"); *Vieux*, 184 F.3d at 64 ("Obviously, counsel's performance was not deficient if he declined to pursue a futile tactic.").

B.    Manufactured Jurisdiction

Relatedly, Mr. Prout contends that counsel was ineffective for not arguing that "the Government manufactured jurisdiction of federal elements to create [a] federal offense that did not satisfy the requirements necessary under [the] Hobbs Act 1951(a) and 18 U.S.C. 924(c)(1)(A)(i)(3)." ECF No. 97 at 2. He initially argues that "the Government manufactured federal jurisdiction on the 924(c) weapon offense by and through the unlawful use of the Hobbs Act statute ...." ECF No. 91 at 68.

In *United States v. Djokich*, 693 F.3d 37 (1st Cir. 2012), the First Circuit briefly addressed the concept of manufactured jurisdiction "as a subset of the outrageous misconduct doctrine."[10] *Id.* at 45; *see also United States v. Vasco*, 564 F.3d 12, 20 (1st

---

[10] With respect to the "outrageous governmental misconduct" doctrine, the First Circuit has stated that:

> In rare and extreme circumstances, a federal court has the authority to dismiss criminal charges as a sanction for government misconduct. But the law frowns on the exoneration of a defendant for reasons unrelated to his guilt or innocence, and, accordingly, the power to dismiss charges based solely on government misconduct must be sparingly. It follows that the outrageous government misconduct

Cir. 2009)(describing manufactured jurisdiction as "a theory of entrapment"). "Where the 'defendant freely participates in the jurisdictional act,' however, courts routinely reject manufactured jurisdiction claims." *Djokich*, 693 F.3d at 45 (quoting *United States v. Peters*, 952 F.2d 960, 963 & n.6 (7th Cir. 1992) (collecting cases)). The *Djokich* court concluded that because "the government provided Djokich an opportunity to conspire to commit a crime in the United States, and he readily seized that opportunity," *id.*, his "interactions with government agents fell well short of any plausible concept of manufactured jurisdiction," *id.* at 45-46 (citing *United States v. Ramos-Paulino*, 488 F.3d 459, 462 (1st Cir. 2007)("We repeatedly have held that the simple solicitation of a criminal act or the mere provision of an opportunity to engage in one does not meet the threshold requirement for a finding of wrongful inducement.")). The appellate court found no evidence that Djokich was "coerced or unduly induced, or evidence that the government engaged in some other type of outrageous misconduct .... " *Id.* at 46; *see also Vasco*, 564 F.3d at 19 (noting that because government had conceded for purposes of appeal that "its actions provided Vasco with the opportunity to commit the crime[,] [t]he dispute thus hinges on whether the record reveals overreaching by the government, through such conduct as intimidation, threats, dogged insistence, excessive pressure or exploitation of a

---

doctrine is reserved for the most appalling and egregious situations. At the very least, the defendant must show that the challenged conduct violates commonly accepted norms of fundamental fairness and is shocking to the universal sense of justice.

*United States v. Guzman*, 282 F.3d 56, 59 (1st Cir. 2002)(internal citations omitted).

noncriminal motive," and that there was no such evidence present). The same is true here.

The Court has already found that there was no unlawful use of the Hobbs Act. It follows that the Government did not "manufacture" federal jurisdiction on that basis. In addition, because Mr. Prout was properly charged with robbery conspiracy under the Hobbs Act, there was no jurisdictional issue that counsel could have raised. *See Dure*, 127 F. Supp. 2d at 280.

Mr. Prout additionally argues that, by providing the firearm, "the informant and agents took steps to cause the interstate element to exist by introducing the firearm solely for the purpose of contriving an interstate nexus." ECF No. 91 at 69 (citing *United States v. Coates*, 949 F.2d 104 (4th Cir. 1991)). Had counsel argued that "the only reason for the insertion of the weapon by the agent was to manufacture jurisdiction ...," *id.* at 70, Mr. Prout contends, he had "a strong probability of having the indictment dismissed for lack of federal jurisdiction," *id.* Mr. Prout misunderstands the basis for federal jurisdiction in this case.

Section 924(c) provides in relevant part:

[A]ny person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime --
    (i) be sentenced to a term of imprisonment of not less than 5 years.
    ...

18 U.S.C. § 924(c)(1)(A). The firearm charge was not the basis of federal jurisdiction. *See id.* (linking use, carrying, or possession of a firearm to a crime of violence or drug trafficking crime "for which the person may be prosecuted in a court of the United States"). Rather, the Hobbs Act robbery conspiracy count, to "knowingly and willfully combine, conspire, confederate, and agree ... to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by robbery ...," ECF No. 8 (Indictment) at 1, provided the basis for federal jurisdiction. The "drug trafficking" element required by § 924(c) was supplied by the object of the conspiracy, "to rob another of property, namely heroin, by means of actual and threatened force, violence, and fear of injury ...." *Id.* Federal jurisdiction already existed, whether or not Mr. Prout was additionally charged under § 924(c), by virtue of § 1951(a).

Mr. Prout also asserts that the Government "injected a firearm into the sting in order to manipulate the sentencing exposure the Petitioner would be exposed to[] ...." ECF No. 91 at 69; *see also id.* (noting that "without the Government supplying the weapon, Petitioner Prout could not have been charged with any 924(c) offense which carried a mandatory minimum and consecutive term"); ECF No. 99 at 23 (arguing that "continuation of the sting was not necessary" once Mr. Prout had committed himself to the robbery and the Hobbs Act violation had been established and that "the Government had no other purpose to supply guns to Petitioner other than to inflate the sentence that Petitioner Prout was facing"). The facts of the case defeat Mr. Prout's contention.

The First Circuit has defined sentencing factor manipulation or entrapment as "the improper enlarge[ment of] the scope or scale of a crime by the government in order to secure a longer sentence than would otherwise obtain." *United States v. Kenney*, 756 F.3d 36, 51 (1st Cir. 2014)(alteration in original)(internal quotation marks omitted); *see also United States v. Jaca-Nazario*, 521 F.3d 50, 57 (1st Cir. 2008)(noting that court has "used the terms 'sentencing entrapment' and 'sentencing factor manipulation' interchangeably").

> An undercover operation may carry with it a risk that law enforcement will unduly pressure a suspect to commit crimes to which he is not predisposed. But sentencing entrapment does not occur unless law enforcement agents venture outside the scope of legitimate investigation and engage in extraordinary misconduct that improperly enlarges the scope or scale of the crime. To establish a claim, the defendant must show that the agents overpowered the free will of the defendant and caused him to commit a more serious offense than he was predisposed to commit. Courts must focus primarily on the behavior and motives of the government. As a secondary inquiry, the court must consider the predisposition of the defendant to commit the crimes.

*Jaca-Nazario*, 521 F.3d at 58 (internal citations and quotation marks omitted); *see also United States v. Barbour*, 393 F.3d 82, 86 (1st Cir. 2004)(citing *United States v. Egemonye*, 62 F.3d 425, 427 (1st Cir. 1995))("Sentencing factor manipulation occurs where law enforcement agents venture outside the scope of legitimate investigation and engage in extraordinary misconduct that improperly enlarges the scope or scale of the crime."). "The defendant bears the burden of establishing sentencing factor manipulation by a preponderance of the evidence," *United States v. Fontes*, 415 F.3d 174, 180 (1st Cir. 2005); *see also Barbour*, 393 F.3d at 86, and the threshold is "very high," *Kenney*, 756 F.3d at 51.

The Government and defense stipulated and agreed to the following facts in the Plea Agreement:

> a. On June 6, 2014, Defendant took possession of a firearm, a Glock .40 caliber pistol.
>
> b. Defendant took possession of the firearm as part of a plan to rob a heroin stash house of two-kilogram[s] of heroin and money and to distribute[] the heroin to others after the robbery.
>
> c. Defendant entered into the plan to rob the heroin stash house with the co-defendant, Emmett Blyden.

ECF No. 46 ¶ 4. The evidence of record further reflects that it was Mr. Prout, not the CI, who asked about the availability of guns for the robbery, because he did not have a gun (although he indicated that he knew how to use one). *See* ECF No. 1 (Affidavit of Special Agent Ed Troiano in support of Criminal Complaint) ¶¶ 7, 9; ECF No. 60 (Presentence Investigation Report ("PSR")) ¶ 20. At a subsequent meeting, Mr. Prout again brought up the subject of the firearms. ECF No. 1 ¶ 11; ECF No. 60 ¶ 23. When the CI produced the weapons, Mr. Prout "instruct[ed] the CI that the guns should be 'wiped down.'" ECF No. 1 ¶ 11. According to the PSR, both Mr. Prout and his co-defendant "took care to avoid leaving fingerprints on their guns." ECF No. 60 ¶ 23. This is clearly not a situation where an overbearing agent forced a weapon into an unknowing and unwilling defendant's hands.[11]

Other than Mr. Prout's assertion, there is no evidence of improper motive or extraordinary misconduct on the part of Government agents involved in the sting, or

---

[11] There is also evidence of predisposition in the record. At the March 9, 2016, sentencing hearing, Mr. Prout was also sentenced for a separate robbery during which he "brandished a firearm." ECF No. 60 ¶ 26.

that he was an unwilling participant. Mr. Prout has not met his burden of demonstrating, by a preponderance of the evidence, that the agents "overpowered [his] free will ... and caused him to commit a more serious offense than he was predisposed to commit," *Jaca-Nazario*, 521 F.3d at 58; *see also Djokich*, 693 F.3d at 46, or provided the firearm simply to boost his sentence, *cf. Barbour*, 393 F.3d at 86 (rejecting argument that agent waited to arrest defendant only to increase his sentence and finding legitimate reason for delaying defendant's arrest). Therefore, again, there was no argument for counsel to make. *See Dure*, 127 F. Supp. 2d at 280.

Based on the foregoing, the Court rejects Mr. Prout's claim that counsel should have argued that the Government manufactured jurisdiction over his case or engaged in sentence factor manipulation.

## C. Racial Profiling/Discriminatory Law Enforcement

Mr. Prout next contends that counsel was ineffective for not challenging the conduct of the ATF as racial profiling and discriminatory law enforcement, in violation of his right to equal protection. ECF No. 78 at 10. Specifically, he asserts that counsel should have argued that "'stash house stings' were selective prosecution and enforced in a racially discriminatory manner." *Id.* According to Mr. Prout, the issue was "ripe for review," because such claims were being litigated in federal courts at the time of his indictment. *Id.* As for prejudice, Mr. Prout asserts that the indictment would have been dismissed had counsel demonstrated that he was being prosecuted for an improper motive. ECF No. 91 at 81.

Federal prosecutors are afforded "broad discretion" to enforce federal laws. *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also United States v. Lewis*, 517 F.3d 20, 25 (1st Cir. 2008)("federal prosecutors must be afforded substantial discretion not only in determining whether to prosecute a suspected violation of federal law but also in deciding what charges should be lodged."). "Once made, these decisions enjoy a presumption of regularity (which includes a presumption of good faith)." *Lewis*, 517 F.3d at 25 (citing *Armstrong*, 517 U.S. at 464; *United States v. Graham*, 146 F.3d 6, 9 (1st Cir. 1998)). However, a decision whether to prosecute "may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (internal quotation marks omitted). The same is true for federal law enforcement officers. *See* ECF No. 99-1, Ex. G at 19 (Excerpt from "Guidance Regarding the Use of Race by Federal Law Enforcement Agencies")(U.S. Dep't of Justice 2003)).

In *Armstrong*, the Supreme Court "consider[ed] the showing necessary for a defendant to be entitled to discovery on a claim that the prosecuting attorney singled him out for prosecution on the basis of his race ...." 517 U.S. at 458.

> A showing of selective prosecution can, of course, undercut the presumption of regularity. The essence of such a showing is that a prosecutor has pursued a case for a constitutionally impermissible reason, such as the defendant's race, religion, or other characteristic cognizable under equal protection principles. Carrying this burden entails a binary showing: the defendant must adduce clear evidence of both the discriminatory effect of the prosecution and the prosecutor's discriminatory intent.

*Lewis*, 518 F.3d at 25 (citing *Armstrong*, 517 U.S. at 465)(internal citation omitted).

The *Armstrong* Court stated that "[t]he justifications for a rigorous standard for the

elements of a selective-prosecution claim ... require a correspondingly rigorous standard for discovery in aid of such a claim." 517 U.S. at 468; *see also United States v. Gilbert*, 75 F. Supp. 2d 12, 14 (D. Mass. 1999)("There is no doubt that *Armstrong* created a heavy burden upon a defendant seeking discovery related to a possible claim of selective prosecution."). Thus, "a defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent." *United States v. Bass*, 536 U.S. 862, 863 (2002)(per curiam)(citing *Armstrong*, 517 U.S. at 465); *see also Lewis*, 518 F.3d at 25 (noting that in order to meet the threshold requirement "a defendant must produce 'some evidence' tending to show both discriminatory effect and discriminatory intent").

With respect to discriminatory effect, "'[s]ome evidence' ... must comprise a credible showing that similarly situated individuals who do not share the protected characteristic were not prosecuted." *Lewis*, 517 F.3d at 25; *see also Armstrong*, 517 U.S. at 470 (describing "required threshold" for showing discriminatory effect as "a credible showing of different treatment of similarly situated persons"). The First Circuit has defined "similarly situated" as "one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *Lewis*, 517 F.3d at 27. As to discriminatory intent, "the evidence in support of the asserted discriminatory intent must consist of a credible showing that the government chose to prosecute at least in part because of, not merely in spite of, the defendant's protected characteristic." *Id.* at 25 (internal quotation marks omitted). In order for discovery to be allowed, the defendant's

evidence must support each of the two requirements, *id.* ("failure on one branch dooms the discovery motion as a whole").

According to Mr. Prout, "there were numerous cases and media articles which at the time of Petitioner's case had been arguing that such 'stash house stings' were discriminatory and constituted racial profiling." ECF No. 99 at 7 (internal citations omitted). He suggests "based on the extensive litigation which was being conducted on such issue by numerous district court[s] in every circuit that counsel had enough information an[d] statistics to show a defined class of individuals to whom he could have compared his claim of selective enforcement and prosecution ...." ECF No. 91 at 80; *see also* ECF No. 99 at 9 ("[H]ad counsel done a minimum amount of investigation into the widely discussed and publicly aired concern of district court judges about 'stash house stings,' ... counsel would have been properly prepared to competently raise the issue of selective enforcement and selective prosecution by ATF."). Mr. Prout has provided exhibits that include: articles indicating that stash house stings "may racially profile targets," ECF No. 91-1, Ex. A at 3; *see also id.*, Ex. B at 6, Ex. E at 12; statistical analyses showing the numbers of minorities targeted and/or prosecuted in stash house stings, *id.*, Ex. C at 8, Ex. D at 10, Ex. H at 27; and excerpts from Government manuals for law enforcement officers, *id.*, Ex. G at 16-25, and prosecutors, *id.*, Ex. I at 29-34. According to Mr. Prout, this "evidence ... shows that there was more than sufficient evidence to meet the requirements of 'some evidence' justifying discovery in this case ...." ECF No. 99 at 13.

24

While it is true that judges have expressed concerns regarding the use of stash house sting operations, *see* ECF No. 91-1, Ex. A at 3-4; *see also McLean*, 85 F. Supp. 3d at 826-28 (stating concerns and citing cases), such generalized concerns fall short of the threshold showing needed to establish discriminatory effect. For one thing, with one possible exception, none of the information submitted by Mr. Prout pertains to cases in Rhode Island, the District of Rhode Island, or even the First Circuit. Exhibit C, for example, lists forty-two cities and counties in which ATF stash house stings were conducted, of which Mr. Prout has "confirmed" that twenty-eight occurred in minority neighborhoods. ECF No. 99-1 at 8. Only one of the areas listed, Essex County, Massachusetts, is within the First Circuit. *See id.* The population statistics from the 2010 census contained in Exhibit H are from Camden City and Camden County, New Jersey. ECF No. 99-1 at 27. For another, even assuming that Mr. Prout has shown that minorities have been more frequent subjects of stash house stings, he has not provided any evidence that similarly situated individuals outside the protected class were not targeted. *See Bass*, 536 U.S. at 863-64 ("Even assuming that the *Armstrong* requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decisionmakers in respondent's case, raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants."); *United States v. Magana*, 127 F.3d 1, 8 (1st Cir. 1997)("The information presented thus addressed only one half of the critical proposition. In order to be permitted discovery in this area, the defendants were required to make a threshold showing that there were similarly situated persons who

were not prosecuted."); *c.f. United States v. Tuitt*, 68 F. Supp. 2d 4, 14 (D. Mass. 1999)("Here, unlike *Magana*, Defendant has offered information pertaining to similarly situated individuals who were not prosecuted.").

Even were the Court to assume that the documents Mr. Prout has provided demonstrate discriminatory effect, he has provided no evidence of discriminatory intent. *See Gilbert*, 75 F. Supp. 2d at 15 ("Defendant has not come forward with evidence specific to her own case that racial consideration played a part in the charging decision.")(internal quotation marks omitted).

Mr. Prout's exhibits do not mandate a conclusion that counsel should have investigated the possibility of selective enforcement and/or prosecution in Mr. Prout's case. Thus, Mr. Prout has not demonstrated that counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687-88 ("When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."); *id.* at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."). Further, Mr. Prout's speculation that had counsel put forth some credible evidence of both discriminatory effect and discriminatory intent the indictment against him would have been dismissed, ECF No. 91 at 81, is simply that—speculation. As noted above, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight ...." *Strickland*, 466 U.S. at 689; *see also id.* ("It is all too tempting for a defendant to second-guess counsel's assistance after

conviction or adverse sentence, and it is all too easy for a court, examining counsel's

defense after it has proved unsuccessful, to conclude that a particular act or omission

of counsel was unreasonable.").

Moreover, the fact that Mr. Prout pled guilty to three of the four Counts of the

Indictment requires that he "show the outcome of the plea process would have been

different with competent advice." *Lafler*, 566 U.S. at 163; *see also Padilla*, 559 U.S.

at 372 (noting that "to obtain relief on this type of claim, a petitioner must convince

the court that a decision to reject the plea bargain would have been rational under

the circumstances"). Mr. Prout has not convinced the Court that such a decision

would have been rational under the circumstances, nor has he attempted to make

that argument. Accordingly, the Court rejects Mr. Prout's allegation that counsel

was ineffective for failing to raise a claim of selective enforcement or prosecution.[12]

### D.  Sentencing Enhancement

Lastly, Mr. Prout argues that counsel was ineffective for allowing the Court to

impose a sentencing enhancement "based on [a] conspiracy conviction without an

---

[12] Regarding Mr. Prout's argument that the Government "has not presented
any sworn affidavit by counsel which indicates that counsel informed the Government
of its [sic] reason for not seeking to argue the issue of selective enforcement or
selective prosecution," ECF No. 99 at 9-10, he misconstrues the burden. It is only
after a defendant presents a "prima facie case of selective prosecution," *Graham*, 146
F.3d at 9, that the Government must "put[] forward adequate countervailing reasons
to refute the charge ...," *id.*, in order to avoid an evidentiary hearing, *see id.*; *see also
id.* (noting that, even assuming that defendant "presented enough evidence to create
a prima facie case of selective prosecution ..., the government refuted this
presumption with adequate reasons for its decisions"). Mr. Prout has not met his
burden of presenting a prima facie case of selective prosecution or that counsel was
ineffective for failing to do so. Therefore, the Government was not required to refute
his charge by affidavit or otherwise.

attached predicate offense, in violation of *Mathis [v. United States*, 136 S. Ct. 2243 (2016)]." ECF No. 78 at 14. Under *Mathis*, Mr. Prout contends, the Court could not use prior state conspiracy convictions "based upon the fact that the state offense is not a categorical match with a federal generic offense because such does not contain elements which involve facts equating to the generic federal offense." ECF No. 91 at 71. Here, "the dismissal of the predicate offense by plea effectively removed any predicate offense which could be used to determine the prior offense that Petitioner Prout was convicted of." *Id.* at 73. Therefore, Mr. Prout concludes, "counsel was ineffective for not challenging properly the way the Court and Government reached its findings that he was a career offender based on two prior convictions but specifically, the alleged conspiracy to murder." ECF No. 99 at 35.

The Court initially observes that counsel could not have made an argument specifically based on *Mathis* for the simple reason that the *Mathis* case had not been decided when Mr. Prout was sentenced. Mr. Prout was sentenced on March 9, 2016. *See* Docket. The Supreme Court's decision in *Mathis* was issued on June 23, 2016. Counsel cannot be faulted for failing to argue a Supreme Court case that had yet to be decided.

That said, counsel did, in fact, argue that Mr. Prout's sentence should not have been enhanced as a career offender on the basis of two state convictions for "crimes of violence."[13] ECF No. 55 (Defendant's Response/Objections to PSR) at 5-13; ECF

---

[13] Pursuant to §4B1.1 of the United States Sentencing Guidelines:

No. 93 (Transcript of March 9, 2016, sentencing hearing) at 6-10. Although Mr. Prout

alleges that counsel "did not properly familiarize himself with caselaw precedent,"

ECF No. 99 at 32, absent the reliance on the yet-to-be-decided *Mathis*, counsel made

many of the same arguments, and cited several of the same cases, at the time of Mr.

Prout's sentencing that Mr. Prout presents in his Motion to Vacate and supporting

memorandum, *compare* ECF No. 55 at 5-13, *and* ECF No. 93 at 6-10, *with* ECF No.

78 at 14, *and* ECF No. 91 at 71-75.

    For example, counsel stated in the defense's objection to the PSR that Mr.

Prout "t[ook] issue with his three prior felony convictions being classified as 'crimes

of violence' ...." ECF No. 55 at 5. With respect to his Massachusetts conviction for

---

    A defendant is a career offender if (1) the defendant was at least
eighteen years old at the time the defendant committed the instant
offense of conviction; (2) the instant offense of conviction is a felony that
is either a crime of violence or a controlled substance offense; and (3) the
defendant has at least two prior felony convictions of either a crime of
violence or a controlled substance offense.

U.S. Sentencing Guidelines Manual §4B1.1(a) (U.S. Sentencing Comm'n 2015).
Section 4B1.2 defined "crime of violence" as follows:

    The term "crime of violence" means any offense under federal or state
law, punishable by imprisonment for a term exceeding one year, that—

        (1) has as an element the use, attempted use, or threatened
use of physical force against the person of another, or

        (2) is burglary of a dwelling, arson, or extortion, involves
use of explosives, or otherwise involves conduct that
presents a serious potential risk of physical injury to
another.

*Id.* §4B1.2(a).

conspiracy to commit murder, counsel argued, "the conviction (Commonwealth of Massachusetts Docket #28074) for conspiracy to commit murder is ... not a crime of violence." *Id.* at 6. Counsel noted the definition of "crime of violence" in §4B1.2 and, using the "categorical approach," as Mr. Prout argues in his memorandum, ECF No. 91 at 71-75, compared that definition to the crime of conspiracy under Massachusetts law, ECF No. 55 at 6-12. Counsel concluded that "Massachusetts' definition of conspiracy encompasses a greater breadth of crimes than does the generic definition. As such, a conviction of conspiracy in Massachusetts is not a crime of violence ...." *Id.* at 12; *see also* ECF No. 93 at 8 (discussing categorical approach). Counsel made a similar argument with respect to Mr. Prout's conviction for conspiracy to commit robbery. ECF No. 55 at 12-13; ECF No. 93 at 10.

Counsel cannot be faulted for failing to make arguments that he did, in fact, present. That the Court did not accept counsel's arguments, ECF No. 93 at 13-14, does not render his assistance ineffective, *see Natanel*, 938 F.2d at 309-10 ("The Constitution does not guarantee a defendant a successful defense ..."). Therefore, the Court rejects Mr. Prout's assertion that counsel failed to challenge properly the Court's use of his prior convictions to find him a career offender and enhance his sentence on that basis.

## CONCLUSION

Mr. Prout's allegations of ineffective assistance of counsel are meritless.[14] Therefore, the Court DENIES Allen Prout's Motion to Vacate his sentence (ECF No. 78) under 28 U.S.C. § 2255.

## RULING ON CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings in the United States District Courts ("§ 2255 Rules"), this Court hereby finds that this case is not appropriate for the issuance of a certificate of appealability, because Mr. Prout has failed to make a substantial showing of the denial of a constitutional right as to any claim, as required by 28 U.S.C. § 2253(c)(2).

Mr. Prout is advised that any motion to reconsider this ruling will not extend the time to file a notice of appeal in this matter. *See* § 2255 Rule 11(a).

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

Date: January 16, 2018

---

[14] Because Mr. Prout has not demonstrated that counsel's performance fell below an objective standard of reasonableness, the Court need not address *Strickland's* prejudice prong. *See Strickland*, 466 U.S. at 697 (noting that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one").